DEREK HANNEMANN ,

                    Plaintiff,                    Case No.: 09-CV-01055

v.

SOUTHERN DOOR COUNTY SCHOOL
DISTRICT, JOE INNIS, and LOIS MAHAFFEY,

in their individual capacities,

                    Defendants.

## DEFENDANTS' BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

The defendants, Southern Door County School District, Joe Innis and Lois Mahaffey, by their attorneys, Crivello Carlson, S.C., respectfully submit this brief in support of their motion for summary judgment.

## PREFACE

Plaintiff Derek Hannemann's amended complaint alleges the following claims:

1. that his May 3, 2007 five day suspension and ultimate expulsion from Southern Door County School District violated Hannemann's liberty and/or property interests procedural due process rights under the Fourteenth Amendment [Amended Complaint, ¶¶5501-5502];

2. that an alleged "lifelong ban" prohibiting Hannemann from entering school grounds violated his liberty and/or property interests in violation of his due process rights [Amended Complaint, ¶¶5503]; and

3. that the alleged "lifelong ban" violated Hannemann's right to intrastate travel in violation of his First and Fourteenth Amendment Rights. [Amended Complaint, ¶¶5504].

Hannemann sues the District on a "Monell" theory [Amended Complaint, ¶5505] and sues District Administrator Joe Innis[1] and former Principal Lois Mahaffey[2] in their individual capacities. [Amended Complaint, p. 1]. Because the undisputed facts do not allow Hannemann relief under applicable law, dismissal is appropriate.

## FACTUAL BACKGROUND

Hannemann was a student in the 9th grade at the Southern Door County High School within the Southern Door County School District during the 2005-2006 school year. (Amended Complaint, ¶401). Hannemann was viewed as a problem student in terms of his inability to get along well with others throughout his tenure. (06/29/10 Hannemann Dep.,[3] pp. 36-38). On May 1, 2006, a student reported seeing Hannemann with the knife while on the school bus. (Amended Complaint, ¶402-404; 05/01/06 Discipline Referral, Ex. H; 06/29/10 Hannemann Dep., p. 22-24). Assistant Vice Principal Steven Bousley questioned Hannemann, and Hannemann admitted to being in possession of the knife. (Amended Complaint, ¶402-404; 05/01/06 Discipline Referral, Ex. H; 06/29/10 Hannemann Dep., p. 22-24).

According to District policy, students and non-students were forbidden to knowingly or voluntarily possess any weapon, defined to include "knives, switchblades or automatically opening blades, daggers, swords, razors, etc." (District Policies, Ex. G, p. 2). Violation of the District Weapons Policy allowed for

---

[1] [See Amended Complaint, ¶¶ 304-305].
[2] [See Amended Complaint, ¶¶ 306-307].
[3] The transcripts of the depositions referred to herein are annexed as Exhibits A –C of the 01/20/11 Affidavit of Michele M. Ford.

confiscation of the weapon, notification of parents, suspension, referral to criminal justice or the juvenile delinquency system and consideration of expulsion. (District Policies, Ex. G, pp. 1–2).

During Bousley's interview of Hannemann, Hannemann explained that he had a fear of getting "jumped". (Ex. I, p. 5). Hannemann also acknowledged that he cut himself for no reason. (Ex. I, p. 6).

Hannemann's father, Rick Hannemann, was called, as well as the school's police liaison officer and Door County Community Programs. (Ex. I, p. 7). Hannemann's father came to the school to attend the meeting. (Ex. I, p. 7). Bousley advised Rick Hannemann that Hannemann had been carrying a knife, and showed Rick Hannemann the knife he had confiscated from Hannemann. (Bousley Affidavit, Ex. J, ¶6). Bousley also advised both Hannemann and his father that Hannemann was suspended for violation of the school weapons policy. (Bousley Affidavit, Ex. J, ¶6).

On May 11, 2006, Superintendent Joseph Innis issued a Notice of Hearing to the Hannemann: the hearing was scheduled for the purpose of determining whether grounds existed to expel Hannemann. (Notice of Hearing, Ex. K). On May 22, 2006, fifteen days from the date of Hannemann's suspension, after the hearing, the Board of Education of the Southern Door County School District expelled Hannemann for engaging in conduct which endangered the property, health or safety of others by virtue of carrying a knife to school. (Findings of Fact and Expulsion Order, Ex. L; 06/29/10 Hannemann Dep., p. 22-25; Innis Dep., p. 25).

Hannemann's expulsion was subject to conditional readmission for the 2006-2007 school year, which included the condition that Hannemann not have any further incidents of gross misconduct. (Expulsion Order, Ex. L, p. 3; 06/29/10 Hannemann Dep., p. 29; Innis Dep., p. 25). The expulsion order also provided that Hannemann would be allowed to complete course work from May 23, 2006 to June 16, 2006 to complete the 2005-2006 school year. (Expulsion Order, Ex. L, p. 3, ¶2).

Hannemann was readmitted for the 2006-2007 school year, subject to the conditional reinstatement order. (Innis Dep., p. 25). On April 27, 2007, Bousley learned that Hannemann's backpack had been inscribed with the statement "Only one bullet left, no one to kill but myself." (04/27/07 Discipline Referral, Ex. M).

Bousley again met with Hannemann and Rick Hannemann. (04/27/07 Discipline Referral, Ex. M). During the meeting, Hannemann became upset and left Bousley's office. (04/27/07 Discipline Referral, Ex. M). Hannemann and his father went to Hannemann's locker and left the school building. (04/27/07 Discipline Referral, Ex. M). Hannemann then returned, demanded to see Bousley, and walked directly into Bousley's office. (04/27/07 Discipline Referral, Ex. M). Hannemann was visibly upset, clenching his fists and breathing heavily. (04/27/07 Discipline Referral, Ex. M).

In an effort to calm him, Principal Lois Mahaffey escorted Hannemann to her office and asked what the problem was. (04/27/07 Discipline Referral, Ex. M). When Bousley arrived, Hannemann confronted Bousley, demanding: "Where are my notebooks? You have my notebooks. My dad says you have my notebooks? Where

are they?" (04/27/07 Discipline Referral, Ex. M). Hannemann's behavior was described by Bousley as threatening, hostile and intimidating. (04/27/007 Discipline Referral, Ex. M). As a result, Hannemann was disciplined for violating the school policy against intimidation and harassment. (04/27/07 Discipline Referral, Ex. M).

On May 1, 2007, one of Hannemann's teachers alerted the police liaison officer to the fact that Hannemann had grabbed another student by the collar in class and stated "I am going to kick your ass. Stop writing in my locker." (05/01/07 Discipline Referral, Ex. N). On May 2, 2007, a meeting was held with Hannemann, his father, Mahaffey and Bousley. (05/01/07 Discipline Referral, Ex. N). Bousley provided Hannemann and his father with notice that the expulsion order was being reviewed and would have an opportunity to be heard on this issue. (Discipline Referral, Ex. N). Bousley noted that he provided "due process" to the Hannemanns during this May 2, 2007 meeting. (Discipline Referral, Ex. N).

On May 4, 2007, Hannemann's parents, his attorney, Administrator Innis, Bousley, Mahaffey, and Hannemann met to discuss Hannemann's situation and his possible expulsion. (05/01/07 Discipline Referral, Ex. N). On May 7, 2007, Hannemann's attorney, Stephen A. Kase, sent a letter to Administrator Innis enclosing a letter from Hannemann and another from his parents which were intended to demonstrate their commitment to a joint solution to Hannemann's problems. (05/07/07 Kase Letter, Ex. O). In the letters, Hannemann blamed his behavior on hazing and bullying from other students, and conditioned compliance with school policies on what was termed a "prompt and effective" response to any

5

future incidents of hazing and harassment. (05/07/07 Kase Letter, Ex. O, p. 2). The Hannemanns agreed, however, that professional counseling might be helpful for Hannemann. (05/07/07 Kase Letter, Ex. O, p. 3).

Hannemann was suspended on May 7, 2007 for these incidents, and also for punching another student and a physical assault, which required intervention by the Door County Sheriff's Department. (06/29/10 Hannemann Dep., pp. 50-51). On May 7, 2007, during a closed session meeting, Innis, Mahaffey and Bousley informed the District of Hannemann's continuing problems with his temper, the reference to suicide written on his backpack and other incidents and threats. (05/07/07 Minutes, Ex. P, p. 1). The District was informed that Hannemann's threatening behavior was escalating. (05/07/07 Minutes, Ex. P, p. 1). Letters from Kase, Hannemann and Rick Hannemann were introduced, and Hannemann's intimidating behavior toward Bousley and Bousley's sense of being threatened were discussed. (05/07/07 Minutes, Ex. P, p. 2). It was the consensus of the Board that administrations' decision to revoke Hannemann's conditional reinstatement and expel him was appropriate. (05/07/07 Minutes, Ex. P, p. 2). The District was advised by Attorney Randall Nesbitt that the decision to enforce the expulsion order was up to administration, so no vote was taken on the matter. (05/07/07 Minutes, Ex. P, p. 2).

Hannemann's parents were advised by letter dated May 11, 2007 that the District had decided to enforce permanent expulsion as a result of Hannemann's violation of the fifth condition in the original expulsion order prohibiting

Hannemann from further incidents of gross misconduct described in the student handbook. (05/11/07 Mahaffey letter, Ex. Q). Mahaffey also advised Hannemann's parents that Hannemann would be allowed to finish his then current coursework so that he could complete the 2006-2007 school year. (05/11/07 Mahaffey letter, Ex. Q; Innis Dep., p. 60).

As a result of telephone calls to Mahaffey and Attorney Nesbitt from Attorney Kase, a review under Wis. Stat. § 120.13 of the permanent expulsion decision was scheduled for May 17, 2007 with Administrator Innis. (05/11/07 Nesbitt letter, Ex. R). On May 14, 2007, Kase forwarded a written letter appealing the revocation of Hannemann's reinstatement, requesting a hearing as provided by Wis. Stat. § 120.13(1)(h)(4). (05/14/07 Kase letter, Ex. S). A memorandum was prepared for Innis describing Hannemann's violent behavior, his May 1, 2007 suspension and May 8, 2007 permanent expulsion. (Summary Report, Ex. T, pp. 1-2). Innis met with Hannemann and his parents along with other representatives of the administration on May 17, 2007. (05/12/07 Kase letter, Ex. V). On June 5, 2007, Hannemann was provided with written notification that the revocation of his early reinstatement and permanent expulsion would remain in effect. (05/05/07 Innis letter, Ex. U). Hannemann's parents also received notification from Innis that Hannemann's revocation and permanent expulsion would be upheld. (05/12/07 Kase Letter, Ex. V).

Kase wrote a letter to Innis on June 12, 2007, urging Innis to reconsider the permanent expulsion. (05/12/07 Kase letter, Ex. V). Kase acknowledged that

Hannemann did not have the right to a school board hearing on the revocation. (05/12/07 Kase letter, Ex. V). Kase did ultimately file an appeal of the institution of the original expulsion order. (DPI Decision and Order, pp. 1-12).

Hannemann, in the meantime, completed the 2006-2007 school year through home coursework. (Innis Dep., p. 25). For the 2007-2008 school year, Hannemann decided to attend Fox Valley Lutheran High School. (06/29/10 Hannemann Dep., pp. 8-9; 01/07/11 Hannemann Dep., pp. 5-8). Hannemann acknowledged that he could have been homeschooled at Southern Door County from the beginning of the 2007-2008 school year onward while his expulsion challenge remained pending, but choose instead to attend Fox Valley. (01/07/11 Hannemann Dep., pp. 5-8). Innis would have recommended granting such a request. (Innis Dep., pp. 61-62). Hannemann and the District agree that Hannemann's own decision, and no decision of the District, caused Hannemann to incur tuition fees because Hannemann himself made the decision to attend a private school. (01/07/11 Hannemann Dep, pp. 6-8; Innis Dep., p. 62). Hannemann admitted that during the time that he was homeschooled while he was expelled and while his expulsion hearing was ongoing, no money was spent for his education that would not have been spent had he attended Southern Door County. (01/07/11 Hannemann Dep., pp. 6-8).

On November 5, 2007, Department of Public Instruction Superintendent Anthony S. Evers issued an order reversing Hannemann's expulsion on the grounds that the Board's notice of expulsion failed to inform Hannemann of the time frame

of his alleged conduct and was therefore defective.  (Decision and Order, Exhibit W, pp. 1-8).  Attorney Nesbitt contacted the Hannemann on behalf of the District to invite Hannemann to return as a student.  (Innis Dep., pp. 59-60).  Hannemann acknowledged that he could have attended Southern Door County after the expulsion order was reversed, but decided not to because he did not want to return and liked his then current school.  (01/07/11 Hannemann Dep., p. 6).

Hannemann did, however, continue to use Southern Door athletic facilities as a non-student, and specifically, used the school weight room and picked up friends. (06/29/10 Hannemann Dep., pp. 64-65; 68-77).  He did not attempt to use the school to protest his expulsion.  (06/29/10 Hannemann Dep., pp. 64-65; 68-77). Hannemann did not intend to participate in any programs offered by the District. (06/29/10 Hannemann Dep., pp. 88-89).

On May 28, 2008, Hannemann had a confrontation with teacher Todd Timm in the locker room about his presence on school grounds as a non-student, during which Hannemann became agitated, confrontational, used inappropriate language, and punched a gym locker.  (03/28/08 Nesbitt letter, Ex. X, pp. 5-6; 06/29/10 Hannemann Dep., pp. 70; 75-77).  Hannemann had incorrectly assumed that he could use the gym and conceded that Timm was within his rights to ask Hannemann to leave:

> Q     So when Mr. Timm told you that you couldn't use the gym and that you should leave, he was well within his rights to do so, correct?
>
> A     Correct.

> Q    And you were wrong in your assumption that you had a
>       right to use the gym?
>
> A    Correct.

(06/29/10 Hannemann Dep., p. 77).  In fact, Hannemann had been put on notice that he was not welcome to use District facilities as of March 28, 2007.  (06/29/10 Hannemann Dep., pp. 89-90).

Attorney Nesbitt, on behalf of the district, advised Hannemann that he was no longer allowed to enter on district property, and entry would be considered a trespass.  (03/28/08 Nesbitt letter, Exhibit X, pp. 5-6; 06/29/10 Hannemann Dep., p. 90).  Hannemann acknowledged that the ban was a direct result of his altercation with a faculty member and had nothing to do with his appeal of his expulsion.  (06/29/10 Hannemann Dep., pp. 71-74).  He agrees that school officials perceived him to be a danger to others.  (06/29/10 Hannemann Dep., pp. 77-79; 82-83).  Hannemann agrees that the District had a right to prohibit people they perceived to be dangerous from coming on to school property.  (06/29/10 Hannemann Dep., pp. 82-83).  Hannemann agrees that his disciplinary history alone was a rational basis for banning him from school grounds:

> Q    So given what Mr. Timm believed about you, his
>       knowledge of your disciplinary history and what he
>       believed about your propensity for violence, that gave
>       him a reasonable basis for not only asking you to leave,
>       but having the school district tell you you could not
>       come back onto school grounds?
>
> A    Yes.
>
> Q    That was a rational basis for that prohibition, correct?
>
> A    Yes.

(06/29/10 Hannemann Dep., pp. 81-82).  In fact, Hannemann does not disagree with

the District's decision to ban him:

> Q    So upon reflection now, having gone through this in detail and recalled all the details, would it be fair to say that you really don't have any criticisms of the district for banning you from school grounds after the expulsion, assuming they honestly believed that you were a dangerous person?
>
> A    As in for the assumption that they believe I am a dangerous person, yes, they are correct in this case.
>
> Q    So if they honestly assumed that you were a dangerous person, then you would not have any criticism of them banning you from the school grounds?
>
> A    Correct.
>
> Q    And we already established that you think they honestly believe you are a dangerous person and did at the time they made the ban, right?
>
> A    Correct.
>
> Q    So your claim that they're doing something wrong by banning you from school grounds has no factual basis, correct?
>
> A    Correct.

(06/29/10 Hannemann Dep., pp. 83-84).

LEGAL ANALYSIS

I.    Standard Of Review

Under Rule 56(c) of the Federal Rules of Civil Procedure, the Court must

grant summary judgment if the evidence offered demonstrates that "there is no

genuine issue as to any material fact and [that] the moving party is entitled to

judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250

(1986). Summary judgment is not a disfavored remedy, but rather, "an integral part of the federal rules as a whole which are designed to secure the just, the speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett* 477 U.S. 317, 327, 106 S.Ct. 2548 (1986). District courts must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A "genuine" factual issue is one that properly can be resolved only by a finder of fact because it may reasonably be resolved in favor of either side. *Liberty Lobby, Inc.*, 477 U.S. at 250.

> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 428

Once a movant meets its initial burden, thereby establishing a *prima facie* case for summary judgment, the opponent of the motion must adduce enough evidence to support a jury verdict in its favor. *Id.* at 249. The sufficiency of this evidence implicates the substantive evidentiary standard of proof that would apply at a trial on the merits. In a civil case such as this, the record must show that the trier of fact could find by a preponderance of the evidence that the movant is entitled to judgment. *Id.* at 252.

The non-movant cannot rest upon the allegations in its pleading, but must set forth specific facts showing that there is a genuine issue for trial. *First Nat'l Bank of Cicero v. Lewco Sec. Corp.*, 860 F. 2d 1407, 1411 (7th Cir. 1988). A dispute concerning facts not material to determinative issues does not preclude summary judgment. *Donald v. Polk County*, 836 F. 2d 376, 379 (7th Cir.1988). Nor is it enough to raise a "metaphysical doubt" with respect to the existence of a genuine issue of triable fact. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). A plaintiff must "go beyond the pleadings and designate the specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 248. The plain language of Rule 56(c) mandates the entry summary judgment…against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial. *Celotex Corp.,* 477 U.S. at 322.

## II. Hannemann Does Not have A Constitutionally Protected Right of Access To School Grounds

"A procedural due process claim requires a two-fold analysis. First, [the court] must determine whether the plaintiff was deprived of a protected interest; second, [the court] must determine what process is due." *Leavell v. Illinois Dept. of Natural Resources,* 600 F.3d 798, 804-805 (7th Cir. 2010), quoting *Pugel v. Bd. of Trustees of Univ. of Ill.,* 378 F.3d 659, 662 (7th Cir.2004). The threshold question for a procedural due process claim is whether there has been an unconstitutional deprivation of life, liberty, or property.

Property interests are not created by the United States Constitution. *Akande*

*v. Grounds*, 555 F.3d 586, 590 (7th Cir. 2009). Rather, they are created and defined by existing rules or understandings that stem from an independent source such as state law-rules. *Akande*, 555 F.3d at 590, citing *Ulichny v. Merton Community School Dist.*, 249 F.3d 686, 700 (7th Cir.2001) (citations omitted); see also *Atterberry v. Sherman,* 453 F.3d 823, 826 (7th Cir.2006) (citation omitted).

Hannemann has not alleged the existence of any state law or rule that allows him access to district property as a non-student. In fact, "[m]embers of the public have no constitutional right of access to public schools" as a matter of law. *Vukadinovich v. Bd. of School Trustees of Michigan City Area Schools,* 978 F.2d 403, 409 (7th Cir. 1992). This ground would require dismissal of any proposed liberty or property based procedural due process claim based on access to District property, and in fact renders the existing claim frivolous. Although Hannemann alleges that his alleged ban from District grounds violates his First Amendment right to intrastate travel and his Fourteenth Amendment procedural due process rights, "members of the public have no constitutional right of access to public schools as a matter of law." *Vukadinovich v. Bd. of School Trustees of Michigan City Area Schools,* 978 F.2d 403, 409 (7th Cir. 1992). In *Vukadinovich*, the court rejected a former teacher's claims that his former employer violated his First Amendment free speech rights by banning him from school property. *Vukadinovich,* 978 F.2d at 407. The Seventh Circuit recognized that schools are not forums to which members of the public have constitutionally guaranteed access. *Vukadinovich,* 978 F.2d at 409.

Where a school is not made a public forum, "[t]he public is not invited in, period."
*Vukadinovich,* 978 F.2d at 409. (quoted source omitted).

It is well established that school officials have the authority to control students and school personnel on school property, and also have the authority and responsibility for assuring that parents and third parties conduct themselves appropriately while on school property. *Lovern v. Edwards,* 190 F.3d 648, 655-656 (4th Cir. 1999), citing *Carey v. Brown,* 447 U.S. 455, 470-71, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) (the Constitution does not leave state officials powerless to protect the public from threatening conduct that disturbs the tranquility of schools); *Goss v. Lopez,* 419 U.S. 565, 582-83, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (a school official's determination of the existence of an ongoing threat of disruption of the academic process can justify immediately removing a person from school property). While the specific contours of the authority and responsibility of school officials are defined by state law, such officials should never be intimidated into compromising the safety of those who utilize school property. *Cf. Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) (public education is by and large committed to the control of state and local authorities).

Consequently, there is no constitutionally protected right, or property or liberty interest in unfettered access to school grounds by non-students. In *Lovern, v. Edwards,* 190 F.3d 648 (4th Cir. 1999) the Fourth Circuit rejected a parent's claims that public school superintendent's order barring him from school property, on ground of parent's "continuing pattern of verbal abuse and threatening behavior

towards school officials," violated parent's constitutional rights of free speech, "right of petition," and "parental rights". *Lovern,* 190 F.3d at 650-652. The court characterizing the claim as "plainly insubstantial and entirely frivolous." *Lovern,* 190 F.3d at 650-652. The court observed: "[The plaintiff's] assertions that school administrators must provide him with boundless access to school property are 'obviously without merit.' [citation omitted]. As the district court noted, 'this case is a monument to what ought not to be in a federal court.'" *Lovern,* 190 F.3d at 650-652.

In *Henley v. Octorara Area School District,* 701 F.Supp. 545 (E.D.Pa.1988), the court rejected the argument that process was constitutionally due as to the imposition of a ban from school property, and specifically the claim that the plaintiff had he had a constitutional right to right to access to school property to attend athletic events. *Henley,* 701 F.Supp. at 550-551. The court stated: "The right to come onto the school property was not such a right as to require any sort of a due process hearing . . ." *Henley,* 701 F.Supp. at 551.

At his deposition, and despite allegations in his complaint to the contrary, even Hannemann agreed that based on his perceived propensity for violence, it was rational for the District to ban him from school grounds. He also agreed that his claim to the contrary "had no factual basis." (06/29/10 Hannemann Dep., pp. 83-84). This ground requires dismissal of any proposed constitutional claim based on access to District property as a matter of law.

III. The Due Process Claims Are Barred By the Availability of Post Deprivation Remedies

Case 1:09-cv-01055-WCG   Filed 01/21/11   Page 16 of 26   Document 30

In evaluating what process satisfies the Due Process Clause, the Supreme Court has distinguished between (a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees.' " *Leavell,* 600 F.3d at 802; *Rivera-Powell v. New York City Bd. Of Elections,* 470 F.3d 458, 465 (2d Cir.2006) (quoting *Hellenic Am. Neighborhood Action Comm. v. City of New York,* 101 F.3d 877, 880 (2d Cir.1996)); *see also Strasburger v. Bd. of Educ., Hardin County Cmty. Unit Sch. Dist. No. 1,* 143 F.3d 351, 358 (7th Cir.1998) ("To show a failure of due process, a plaintiff might show that state procedures as written do not supply basic due process or that state officials acted in [a] 'random and unauthorized' fashion in depriving the plaintiff of his protected interest." (quoting *Parratt v. Taylor,* 451 U.S. 527, 540, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981)). If the plaintiff alleges that "the deprivation is pursuant to an established state procedure, the state can predict when it will occur and is in the position to provide a pre-deprivation hearing." *Rivera-Powell,* 470 F.3d at 465. "Under those circumstances, 'the availability of post-deprivation procedures will not, *ipso facto,* satisfy due process.' " *Id.* (quoting *Hellenic Am. Neighborhood Action Comm.,* 101 F.3d at 880)).

By contrast, "[w]hen the state conduct in question is random and unauthorized, the state satisfies procedural due process requirements so long as it provides [a] meaningful post-deprivation remedy." *Id.* For a plaintiff alleging a procedural due process claim based on "random and unauthorized" conduct of a state actor, the plaintiff must either avail herself of state post-deprivation remedies "or demonstrate that the available remedies are inadequate." *Doherty v. City of*

17

*Chicago,* 75 F.3d 318, 323 (7th Cir.1996), citing *Daniels v. Hannemann,* 474 U.S. 327, 339-40, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). If the plaintiff has not availed herself of state remedies, he cannot " 'state a valid procedural due process objection ... if [he] does not include a challenge to the fundamental fairness of the state procedures.' " *Hamlin v. Vaudenberg,* 95 F.3d 580, 583 (7th Cir.1996), quoting *Doherty,* 75 F.3d at 323.

Hannemann's claims are challenges to the "random and unauthorized" actions of the state officials in question, i.e., to their unforeseeable conduct in failing to follow the requirements of existing law defining the procedure for expulsion in the way in which notice was given and in failing to conduct a hearing regarding denial of access to school grounds. *See Strasburger,* 143 F.3d at 358 (citing *Parratt,* 451 U.S. at 540; *Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990)). Regardless of whether Hannemann could offer sufficient evidence to show that the District used established procedures improperly, such conduct would amount to "random and unauthorized" conduct, which violates the Due Process Clause only if there is no adequate post-deprivation state law remedy. *See Doherty,* 75 F.3d at 323. It is well established that the failure to allege that state post-deprivation remedies are inadequate requires dismissal of a due process claim for failure to state a claim upon which relief may be granted. *Leavell,* 600 F.3d at 802 (upholding Rule 12(b) dismissal of procedural due process claims for failure to allege inadequacy of state post-deprivation remedies); *Doherty*, 75 F.3d at 323-324 (same).

Hannemann has not alleged, let alone demonstrated, that the remedies provided by the state of Wisconsin are inadequate, nor could he. Wis. Stat. §120.13(1) provides for an extensive procedural remedy for rule enforcement as it pertains to discipline, including expulsion, which Hannemann used sucessfully. The constitutionality of this procedure has been recognized. See *Racine Unified School Dist. v. Thompson*, 107 Wis.2d 657, 321 N.W.2d 334 (Ct.App. 1982).

### IV. Hannemann's Liberty Interests Were Not Implicated By His Suspension, Expulsion or Ban

Hannemann asserts that his May, 2007 suspension and expulsion deprived him of his liberty interests in his education without due process of law, but this claim is without foundation. Despite his suspension and subsequent expulsion, Hannemann's education continued. In fact, he completed his studies by the end of the school year. Accordingly, Hannemann cannot complain of being deprived of a basic education, Cf. *Nevares v. San Marcos Consol., ISD,* 111 F.3d 25, 26-7 (5th Cir.1997). Instead, Hannemann complains of being denied participation in extracurricular activities. These other activities, however, will not support relief. While it is true that a student has protected interests in a state provided public education, *Goss v. Lopez* 419 U.S. 565, 574, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), the Constitution's due process guarantees do not protect a student's interests in participating in extracurricular activities, *Niles v. University Interscholastic League,* 715 F.2d 1027, 1031 (5th Cir.1983).

### V. The Suspension Did Not Violate Hannemann's Due Process Rights

"Review and revision of a school suspension on substantive due process grounds would only be available in a rare case where there was no 'rational relationship between the punishment and the offense.' " *Brewer v. Austin Indep. Sch. Dist.,* 779 F.2d 260, 264 (5th Cir.1985) (citation omitted); *see Petrey v. Laugher,* 505 F.Supp. 1087, 1091 (E.D.Ky.1981) ("If a penalty is so grossly disproportionate to the offense as to be arbitrary in the sense that it has no rational relation to any legitimate end, it may be a violation of ... substantive due process."). In determining whether a plaintiff's substantive due process right has been violated, the proper test is merely whether the government action is rationally related to a legitimate government interest. *San Antonio Indep. School Dist. v. Rodriguez,* 411 U.S. 1, 38-40, 93 S.Ct. 1278, 1299-1301, 36 L.Ed.2d 16 ... (1973). The Supreme Court has "repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials ... to prescribe and control conduct in the schools." *Tinker v. Des Moines Indep. Community School Dist.,* 393 U.S. 503, 507, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 ... (1969); see also *Hill v. Rankin County, Miss. Sch. Dist.,* 843 F.Supp. 1112, 1115-16 (S.D.Miss.1993); *see Craig v. Selma City Sch. Bd.,* 801 F.Supp. 585, 595 (S.D.Ala.1992) ("state action infringing on a person's right to obtain a public education is not unconstitutional under substantive due process analysis as long as that action is directed to a legitimate purpose and is rationally related to achieving that purpose"); *see also Garcia v. Miera,* 817 F.2d 650, 655 (10th Cir.1987) (quoting *Hall v. Tawney,* 621 F.2d 607, 613 (4th Cir.1980)) (" 'the substantive due process inquiry in school corporal punishment cases must be

whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience' "), *cert. denied,* 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988). Expelling a student for possession of a weapon on school property does not violate substantive due process in that the penalty is not grossly disproportionate to the offense. *See, e.g., Mitchell v. Board of Trustees,* 625 F.2d 660, 663-64 (5th Cir.1980). Here, there is a rational relationship between the offense and the penalty. Schools have a legitimate interest in keeping weapons out of schools.

Additionally, federal courts should not ordinarily intervene in the resolution of conflicts which arise in the daily operation of school systems. Local school boards have a legitimate and substantial community interest in promoting respect for authority and traditional values. *Haverkamp v. Unified Sch. Dist. No. 380,* 689 F.Supp. 1055, 1058 (D.Kan.1986) (citing *Board of Educ. v. Pico,* 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982)); *see Mitchell v. Board of Trustees of Oxford Municipal Separate Sch. Dist.,* 625 F.2d 660, 664 (5th Cir.1980) ("school disciplinary matters are best resolved in the local community and within the school system").

Hannemann's May, 2007 suspension was admittedly based on his own violent behavior. Hannemann cannot argue that the suspension to deter misconduct of this nature was unconstitutional. It would undermine the ability of school officials to take prompt action to protect the student body from harmful and disruptive

behavior by non-students. *See Grayned v. Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (there exists a compelling interest in having an undisrupted school session conducive to student learning); *cf. New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (special needs of the school environment recognized by the Court); *see Wood v. Strickland,* 420 U.S. 308, 326, 95 S.Ct. 992, 1003, 43 L.Ed.2d 214 (1975) (The system of public education in this Nation relies necessarily upon the judgment of school administrators and school board members.).

VI.  The Absence of an Unconstitutional Policy, Practice or Custom Requires Dismissal of Hannemann's Claims Against the District

Recovery under § 1983 from a municipal entity is "limited to acts that are, properly speaking, acts 'of the municipality' - that is acts which the municipality has officially sanctioned or ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986); *Bryan County Commissioners v. Brown*, 137 L.Ed.2d 626, 639 (1997). Civil rights liability cannot be based on a *respondeat superior* theory. *Bryan County, infra.*

The Supreme Court recognizes two types of municipal claims: those alleging direct injury by intentional acts of legislative bodies or authorized decision makers, and those alleging indirect injury, i.e., where a municipality allows an employee to engage in unconstitutional conduct. *Bryan County, infra.* In "direct injury" cases, the "rigorous scrutiny" standard is held to be unnecessary, because "resolving . . . issues of fault and causation is straightforward". *Bryan County*, 137 L.Ed.2d at 639.

In "indirect injury" cases, however, the employee's conduct is the focus, and the danger of imposition of *respondeat superior* liability increases. *Bryan County*, 137 L.E.2d at 639-40. The "rigorous scrutiny" standard was adopted to prevent this, as the *Bryan* court expressly observed. *Bryan County*, 137 L.Ed.2d at 640-41.

The deprivation must be:

1.  the result of an express policy, statement, ordinance, or regulation that, when enforced, causes a constitutional deprivation;

2.  one of a series of incidents involving others amounting to an unconstitutional practice so permanent, well-settled, and known as to constitute a "custom or usage" with force of law;

3.  caused by a decision of a municipal policymaker with final policymaking authority in the area in question, and the decision is intended to govern future cases with the force of law; or

4.  caused by the absence of policy where the need for policy is apparent.

*McCormick v. City of Chicago*, 230 F.3d 319 (7th Cir. 2000); *Baskin v. City of Des Plaines*, 138 F.3d 701, 704-05 (7th Cir. 1998) (recognizing that a municipality can be said to have violated an individual's constitutional rights by its "express policy that, when enforced, causes a constitutional deprivation," or by its "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law.").

Hannemann's complaint fails to allege an unconstitutional policy, practice or custom authorizing any of the conduct alleged in his complaint. This ground is independently sufficient to require dismissal of his claim against the District as a matter of law.

## VII. Qualified Immunity Bars Any Individual Capacity Claims.

Assuming, arguendo, Hannemann has alleged a cognizable individual capacity claim, government officials performing discretionary functions are shielded from liability in their individual capacity insofar as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1992); *Hinnen v. Kelly*, 992 F. 2d 140, 142 (7th Cir. 1993). Qualified immunity is a "powerful shield that insulates [government] officials from suit." *Gregesich v. Lund*, 54 F. 3d 410, 413 (7th Cir. 1995).

The question of whether immunity attaches is a question of law, and is always one for judicial determination, even though pertinent facts may be in dispute. *Rakovich v. Wade*, 850 F. 2d 1180, 1202 (7th Cir. 1988) (en banc), cert. denied, 488 U.S. 968, overruled on other grounds by *Spiegla v. Hull*, 371 F. 3d 928, 941-42 (7th Cir. 2004). Where immunity is raised at the summary judgment stage, the district court must conduct the following two-part analysis: (1) does the substantiated conduct set out a constitutional violation; and (2) were the constitutional standards clearly established at the time in question. *Saucier v. Katz,* 533 U.S. 194, 121, S. Ct. 2151 (2001); see also *Jones v. Wilhelm*, 425 F. 3d 455, 460-61 (7th Cir. 2005). Hannemann must establish both prongs in order to defeat the defense of qualified immunity. *Jones*, 425 F. 3d at 461.

Defendants have located no authority indicating that any constitutional rights were violated amounts to a constitutional deprivation by any stretch of logic.

To the extent an individual capacity claim might be alleged, qualified immunity is yet another ground requiring summary judgment.

CONCLUSION

Based on the foregoing, Southern Door County School District, Joe Innis and Lois Mahaffey respectfully request that the Court grant their motion for summary judgment and dismiss the Complaint with prejudice. They further request that the costs, fees and disbursements of this action be awarded.

Dated this 20th day of January, 2011.

s/ Michele M. Ford_____
State Bar No.: 1000231
Attorney for Defendants
CRIVELLO CARLSON, S.C.
710 N. Plankinton Avenue
Milwaukee, WI 53203
Telephone: 414.271.7722
Fax: 414.271.4438
Email: mford@crivellocarlson.com