# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

DEREK HANNEMANN,

       Plaintiff,

      v.                                        Case No.09-C-1055

SOUTHERN DOOR COUNTY SCHOOL
DISTRICT, JOE INNIS, LOIS MAHAFFEY,
and STEVE BOUSLEY in their individual
capacities,

       Defendants.

## MEMORANDUM AND ORDER

Plaintiff Derek Hannemann brought this § 1983 action against Southern Door County School District, Joe Innis the District Superintendent, Southern Door County High School Principal Lois Mahaffey and Assistant Vice-Principal Steve Bousley for damages and injunctive relief. Hannemann alleges that he was suspended and then expelled from school without due process of law in violation of the Fourteenth Amendment to the United States Constitution. He also claims that his procedural due process rights and his right to intrastate travel were violated when he was banned from school property. Presently before the Court is the defendants' motion for summary judgment (Dkt. 29), which will be granted for the reasons set forth herein.

## BACKGROUND

Derek Hannemann was a student in the ninth grade at the Southern Door County High School within the Southern Door County School District during the 2005-2006 school year.

(Plaintiff's Response to Defendants' Proposed Findings of Fact (hereinafter "PRDPFF"), Dkt. 39 ¶1.) Derek was viewed as a problem student in terms of his inability to get along with others throughout his tenure. (PRDPFF ¶2.) On May 1, 2006, a student reported seeing Derek with a knife on the school bus after school on April 28, 2006. (PRDPFF ¶ 3.) Assistant Vice-Principal Steven Bousley immediately questioned Derek, who eventually turned the knife over to Bousley. (PRDPFF ¶4.) During his interview with Bousley, Derek expressed a fear of getting jumped; he also stated that he had cut himself with the knife for no reason. (PRDPFF ¶ ¶ 7-8.) Bousley confiscated the knife which was six inches long when fully open and had about a two inch blade. (Photograph of knife located at Ex. I to Aff. Of Michelle Ford, Dkt. 32.)

The Southern Door County School District had previously adopted a weapons policy. The District policy forbids students from knowingly or voluntarily possessing any weapon, defined to include "knives, switchblades or automatically opening blades, daggers, swords, razors, etc." (PRDPFF ¶5.) If a student brings a weapon to school the District's policy calls for school officials to confiscate the weapon, notify the parents, and to hold an administrative hearing. (PRDPFF ¶ 6.) The policy also allows school officials to suspend a student who brings a weapon to school for up to fifteen days and to consider making an expulsion recommendation to the district administrator. (*Id.*)

In accordance with this policy Southern Door County High School notified Derek's father, Rick Hannemann, that his son had brought a knife to school. On May 1, 2006, the same day Derek's knife was confiscated, Assistant Vice Principal Bousley set up a meeting with Derek and his father. At the meeting Bousley and the Hannemanns discussed the situation regarding the knife.

Assistant Vice Principal Bousley informed the Hannemanns that Derek was being suspended for violating the weapons policy. (PRDPFF ¶¶ 11-12.)

The School District also scheduled a hearing for the purpose of determining whether grounds existed to expel Derek. On May 11, 2006, Superintendent Innis issued a Notice of Hearing to the Hannemanns informing them of a formal hearing on May 22, 2006, to consider the school administration's request that Derek be expelled for gross misconduct, namely, possession of a six inch lock-blade knife and exposing the knife while on the school bus. The notice also apprised the Hannemanns of their right to be present, to cross-examine witnesses, to present evidence, and to be represented by counsel. (PRDPFF ¶¶ 13.) On May 22, 2006, the Board of Education of the Southern Door County School District held the scheduled hearing. Derek and his parents were present at the hearing. After considering the evidence presented, the Board voted to expel Derek for engaging in conduct which endangered the property, health or safety of others by carrying a knife to school. (PRDPFF ¶ 14.)

As of May 22, 2006, only about four weeks remained in the 2006 school year, and the School District allowed Derek to complete his course work from home. (PRDPFF ¶ 16.) In addition, although the expulsion ordered was until Derek's twenty-first birthday, the order provided for early reinstatement for the 2006-2007 school year subject to several conditions, including that Derek would have "no further incidents of gross misconduct described in the student handbook." (PRDPFF ¶ 15, Ford Aff., Ex. L at 3.)

The Hannemanns took advantage of conditional reinstatement, and Derek returned to Southern Door County High School for the 2006-2007 school year. (PRDPFF ¶¶ 15, 17.) The first half of the school year passed without incident. However, on April 27, 2007, Assistant Principal

3

Bousley learned that the words, "Only one bullet left, no one to kill but myself," were written on Derek's backpack. (PRDPFF ¶ 18.) Bousley met with Derek and his father about the notation on his backpack. After the meeting, the Hannemanns went to Derek's locker and then left the school building. Later that day Derek – without his father – returned to Bousley's office and accused Bousley of taking his notebooks. At that point Principal Lois Mahaffey escorted Derek into her office and asked him what the problem was. Derek was visibly upset, clenching his fists and breathing heavily. (PRDPFF ¶ 23.) Bousley described Derek's behavior as threatening, hostile, and intimidating. (PRDPFF ¶ 26.) As a result, a discipline referral was written for Derek's behavior. (PRDPFF ¶ 27.)

Four days later, on May 1, 2007, another incident occurred. A teacher brought Derek to the principal's office for grabbing another student by the collar in class and saying: "I am going to kick your ass. Stop writing in my locker." (PRDPFF ¶ 28-29.) The next day Bousley and Principal Mahaffey met with Derek and his father. (PRDPFF ¶¶ 29-30.) On May 4, 2007, Derek's's parents, his attorney, Superintendent Innis, Bousley, Mahaffey, and Derek met to discuss Derek's situation and his possible expulsion. (PRDPFF ¶ 30.) Derek was suspended on May 7, 2007, as a result of these incidents and another incident where Derek punched a student. (PRDPFF ¶ 35.) Later that evening, at the school board's regularly scheduled meeting, Derek's expulsion was discussed in a closed session. (PRDPFF ¶ 36.) No vote was taken on the Hannemann situation by the school board, however, because the decision whether to enforce the expulsion was not up to the board. Rather, it was a decision Principal Mahaffey needed to make. (PRDPFF ¶ 40.) She decided to enforce the expulsion. Derek and his parents were advised by letter dated May 11, 2007, that the District had decided to enforce the permanent expulsion as a result of Derek's violation of the fifth condition in the original expulsion order prohibiting Hannemann from further incidents of gross

4

misconduct described in the student handbook. (PRDPFF ¶ 41.)  At that point several weeks remained in the 2006-2007 school year and Derek was again allowed to complete his course work from home.  (PRDPFF ¶ 42.)

Derek's attorney requested a hearing as provided by Wis. Stat. § 120.13(1)(h)(4).  (PRDPFF ¶ 44.)  On May 17, 2007, Superintendent Innis met with the Hannemanns.  On June 5, 2007,  the Hannemann's received written notification that the expulsion decision would remain in effect. (PRDPFF ¶ 47.)

Derek enrolled in Fox Valley Lutheran High School for the 2007-2008 school year. (PRDPFF ¶¶ 53-54.)  In September of 2007 Derek appealed his original May 22, 2006 expulsion to the Superintendent of the Wisconsin Department of Public Instruction.  On November 5, 2007, the State Superintendent issued an order reversing Derek's expulsion on the ground that the Board's May 11, 2006 notice of expulsion failed to inform the Hannemann of the time frame of his alleged conduct and was therefore defective. (PRDPFF ¶ 58.)

Shortly after this reversal the District contacted the Hannemanns to ask whether Derek would be returning to Southern Door County High School.  (PRDPFF ¶ 59.)  By this time, Derek was apparently comfortable in his private school and, given the fact that the District indicated an intent to appeal the State Superintendent's decision if he did return, the Hannemanns decided that Derek would not return to Southern Door.  (PRDPFF ¶ 60.)  Derek therefore admits that the tuition and fees incurred in private school were not caused by the District. (PRDPFF ¶ 56.)  Derek continued to use the Southern Door weight room, however, and would occasionally drive on the school grounds to pick up friends.  (PRDPFF ¶¶ 61, 66.) On March 28, 2008, a teacher saw Derek in the weight room and told the former student to leave.  Derek became agitated, confrontational,

used inappropriate language, and punched a gym locker. (03/28/08 Nesbitt letter, Ex. X, pp. 5-6; 06/29/10 Hannemann Dep., pp. 70; 86-87). (PRDPFF ¶ 64.) Based on the teacher's report of Derek's behavior in the locker room the School District's attorney sent Derek a letter stating that "you are no longer to enter upon the property of the Southern Door County School district for any purpose effective immediately." (PRDPFF ¶ 67.) The Hannemanns were not given notice that the School District was considering imposing such a ban. (Plaintiff's Proposed Findings of Fact (hereinafter "PPFF") Dkt. 38 at ¶ 38.) Nor were the Hannemanns given an opportunity to be heard concerning the ban, which had no stated end date. (PPFF ¶¶ 39-40.) Through counsel, they sent the District's attorney a letter asking what authority he had that would allow such a ban, but received no response. On June 4, 2008, Derek drove onto school property to pick up a friend and was pulled over by a police officer who issued him a trespassing citation. (PPFF ¶ 45.)

Based on the above facts, Derek asserts four claims: (1) that the May 3, 2007 suspension imposed by Defendant Lois Mahaffey, the Principal of Southern Door High School, deprived him of his liberty or property without procedural due process; (2) the expulsion order denied him liberty or property without procedural due process because he was not afforded adequate notice or a meaningful hearing; (3) that by banning Derek from school property without notice or a hearing the defendants deprived him of procedural due process; and (4) that the defendants violated Derek's right to intrastate travel when they banned him from school property. (Amend. Compl. ¶¶ 5501-5505.)

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986); *McNeal v. Macht,* 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson,* 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## ANALYSIS

### A. Five-Day Suspension in May 2006

Derek first claims that "Defendant Mahaffey deprived him of his liberty or property or both without procedural due process of law, in violation of the Fourteenth Amendment to the United States Constitution when she imposed the May 3, 2007, five-day suspension without constitutionally adequate pre-deprivation due process." (Am. Compl. ¶ 5501.)

The Supreme Court has held that high school students facing temporary suspensions "must be given *some* kind of notice and afforded *some* kind of hearing" in order to avoid "unfair or mistaken exclusion from the educational process." *Goss v. Lopez,* 419 U.S. 565, 579 (1975) (emphasis in original). In *Goss*, the Court characterized the required process as "'rudimentary', amounting only to 'an informal give-and-take between student and disciplinarian.'" *Schaill by Kross v. Tippecanoe County School Corp.,* 864 F.2d 1309, 1323 (7th Cir.1988) (quoting *Goss,* 419 U.S. at 584, 95 S.Ct. 729). For an academic suspension of ten days or less, due process requires that the "student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Goss,* 419 U.S. at 581, 95 S.Ct. 729.

The undisputed evidence in the record before me establishes that Derek was provided due process before the five-day suspension was imposed. He was given oral notice of the charge against him and provided an opportunity to present his side. Indeed, the undisputed evidence shows that Vice-Principal Bousley confronted Derek with the allegation that he had a knife on the bus, and Derek admitted it was true. (Am. Compl. ¶ 404.) Though he initially denied having the knife on his person, he eventually took it out of his pocket and handed it over to Bousley. *Goss* requires no more.

Nevertheless, the District's policy also called for immediate notification of the parent. Derek's father was called, and he immediately came to the school where he met with his son and school officials. (PPFF ¶ 6.) The meeting focused on the events related to the knife and Hannemann's self-destructive behavior. During the May 1, 2006 meeting Derek told the assistant principal he was afraid of "getting jumped" and he admitted he had cut himself for no reason earlier

8

in the semester. Derek and his father had an opportunity to speak at the meeting. Derek's father stated that Derek had been picked on throughout elementary school and middle school. At the conclusion of the meeting Derek was suspended for five days "pending possible expulsion." (Aff. of Michelle Ford, Dkt. 32, Ex-H.)

The May 1, 2006 meeting afforded Derek the requisite "informal give-and-take between student and disciplinarian." *Schaill by Kross* 864 F.2d at 1323. Other courts have reached the same conclusion. *See Smith v. Chippewa Falls Area Unified School Dist.,* 302 F. Supp.2d 953, 955-56 (W.D. Wis. 2002) (summary judgement granted for school administrators who, in conjunction with suspending student from athletics, interviewed the student about underage drinking and phoned student's father who came to school to meet with administrators); *See also Risica ex rel. Risica v. Dumas,* 466 F. Supp. 2d 434 (D. Conn. 2006) (holding that school officials did not deprive student of his procedural due process rights before suspending him for ten days, where student and his parents were informed about decision to suspend him in response to discovery of "hit list" student had allegedly prepared, and student admitted making list); *See also Foster v. Tupelo Public School Dist.,* 569 F. Supp. 2d 667 (N.D. Miss. 2008) (holding that high school student was not denied adequate hearing, in violation of her procedural due process rights, where, prior to being suspended for less than ten days for allegedly intentionally cutting herself, she was afforded informal "give-and-take" with assistant principal and her mother and was permitted to offer her side of the story). Taking the facts in the light most favorable to Derek, I find no genuine issue of material fact related to whether Derek was denied procedural due process prior to being suspended. Accordingly, Derek's claim relating to his suspension will be dismissed.

**B. Expulsion**

Derek alleges that the defendants deprived him "of his liberty or property or both without procedural due process of law, in violation of the Fourteenth Amendment to the United States Constitution when they expelled him from school without constitutionally adequate notice or, thus, a meaningful hearing." (Am. Compl. 5502.) As *Goss* made clear, the right of a high school student to a free public school education, once provided by a state, is constitutionally protected. 419 U.S. at 574. Moreover, where the school district seeks not merely a relatively brief suspension but expulsion of the student, more than the minimal procedural protection outlined in *Goss* must be provided. Still, the constitutionally required procedure is not elaborate. The Seventh Circuit described the procedural requirements that are constitutionally mandated for expelling a high school student in *Remer v. Burlington Area School District*:

> To comport with due process, expulsion procedures must provide the student with a meaningful opportunity to be heard. The proceedings need not, however, take the form of a judicial or quasi-judicial trial. As long as the student is given notice of the charges against him, notice of the time of the hearing and a full opportunity to be heard, the expulsion procedures do not offend due process requirements.

286 F.3d 1007, 1010 (7th Cir. 2002) (internal quotations and citations omitted).

To be clear, Hannemann was expelled on May 22, 2006, but was conditionally readmitted for the 2006-2007 school year. On May 11, 2007, his conditional readmission was revoked. It is not readily apparent whether Derek's lawsuit challenges the original May 22, 2006 expulsion or the May 11, 2007 revocation of his conditional readmission. The Court will therefore address both.

**1. May 22, 2006 Expulsion**

On May 11, 2006, the School District sent the Hannemanns written notification that a hearing would be held on May 22, 2006, to determine whether Derek would be expelled for

possession of a knife. (Aff. of Michele Ford, Dkt. 32 at K.) The notice informed the Hannemanns of their procedural rights: to appear at the hearing, to be represented by an attorney, to cross examine witnesses, and to present witnesses and evidence. (*Id.*) The letter also informed Derek and his parents of their right to appeal an expulsion decision. (*Id.*) On May 22, 2206, Derek and his parents appeared at the hearing and were given an opportunity to present evidence to cross examine witnesses, and to respond to the allegations. The School Board voted to expel Derek.

The Hannemanns eventually appealed the expulsion after Derek's early reinstatement was revoked in May 2007. On November 5, 2007, the Superintendent Elizabeth Burmaster reversed Hannemann's May 22, 2006 expulsion in a decision authored by her then deputy Anthony Evers. The State Superintendent concluded that the May 11, 2006 letter notifying the Hannemanns of the expulsion hearing was inadequate because it failed to provide a date or time frame for the alleged misconduct. (State Superintendent's November 5, 2007 Decision and Order available at Aff. of Michele Ford, Dkt. 32, Ex. W.) Derek and his parents were informed that the expulsion hearing related to possession of a knife, but they were not told that the board would consider his possession on *multiple* dates. (*Id.*) In reaching her decision that the notice was defective, the State Superintendent reviewed the transcript of the expulsion hearing and noted references to Derek bringing a knife to school on multiple occasions. (*Id.*) The School Board voted to expel Derek but it was not clear to what extent, if at all, the Board based its decision on evidence that Derek had a knife on more than one occasion. The State Superintendent concluded that the notice to the Hannemanns was insufficient to ensure that he knew the School Board might consider Derek's possession of a knife on *multiple* occasions as part of the expulsion decision. (*Id.*)

While the Hannemanns may not have received the detailed notice required under Wis. Stat. § 120.13(1)(c)4, Derek does not necessarily have a claim for a federal constitutional violation.  In the words of the Seventh Circuit, "[a]s we tirelessly but unavailingly remind counsel in this Court, a violation of state law ... is not a denial of due process, even if the state law confers a procedural right." *Osteen v. Henley,* 13 F.3d 221, 225 (7th Cir.1993); *See also Goros v. County of Cook,* 489 F.3d 857, 859 (7th Cir.2007) ("State law defines property; federal law defines the process that is 'due.'").  As noted above, the Seventh Circuit has explained that "[a]s long as the student is given notice of the charges against him, notice of the time of the hearing and a full opportunity to be heard, the expulsion procedures do not offend due process requirements." *Remer,* 286 F.3d at 1010. The notice Hannemann received satisfies this standard.

Derek certainly knew the time and place of the hearing.  And he knew the nature of the charges against him: bringing a knife to school.  The notice advised Derek and his parents that the charge being considered by the Board was "**Gross misconduct during school: possession of a 6 inch lock-blade knife and exposing the knife while on the school bus.**"  (Notification Letter available at Ex. K to Decl. of Michele Ford, Dkt 32) (emphasis in original).  The information contained in the notice, considered in the context of the surrounding circumstances, was sufficient to apprise the Hannemanns of the nature of the charge against him. *See Brown v. Plainfield Community Consol. Dist. 202,* 522 F. Supp.2d 1068, 1076 (N.D. Ill. 2007) (expelled student "failed to allege a cognizable procedural due process claim" where student and his mother received notice of charges against him when both were called to dean's office to discuss the incident after it was first reported by teacher; student was also given notice of hearing since he and his mother were present at hearing along with their attorney).  Here Derek and his parents were certainly well aware that the

School Board would consider his possession of a knife on April 28 and May 1, 2006 – the dates Derek admitted to having the knife during a meeting with his father and the assistant principal. The fact that the School Board may have ultimately considered Derek's possession of knife at school on other occasions in deciding whether expulsion was appropriate is not sufficient to make the School Board's notice constitutionally defective. Even assuming the notice the Hannemanns received was constitutionally inadequate, however, Derek's procedural due process claim would still fail.

A procedural due process claim requires a two-fold analysis: first, the court must determine whether the plaintiff was deprived of a protected interest; second, it must determine what process is due. *Pugel v. Bd. of Trustees of Univ. of Ill.*, 378 F.3d 659, 662 (7th Cir. 2004). As already noted, a public school student's interest in remaining in school and completing his education is a constitutionally protected interest. Thus, the only question is whether Derek was afforded the constitutionally required process.

In evaluating what process satisfies the Due Process Clause, the Supreme Court has distinguished between (a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees. *Zinermon v. Burch*, 494 U.S. 113, 132 (1990); *Leavell v. Illinois Dept. of Natural Resources*, 600 F.3d 798, 804 (7th Cir. 2010). In situations where a State acts with the intent to deprive a person of a constitutionally protected interest, it is usually feasible to provide notice and a pre-deprivation hearing, and the State must generally do so regardless of the adequacy of a post-deprivation tort remedy. *Zinermon*, 494 U.S. at 132. "Conversely, in situations where a pre-deprivation hearing is unduly burdensome in proportion to the liberty interest at stake, . . . . or where the State is truly unable to anticipate and prevent a

random deprivation of a liberty interest, post-deprivation remedies might satisfy due process." *Id.* (internal citation omitted).

A school district's decision to expel a student from school falls into the first category, so that it is generally feasible to provide notice and a hearing before the expulsion occurs. Thus, the Constitution mandates notice and a hearing before a student can be expelled. *Remer*, 286 F.3d at 210. Consistent with this constitutional mandate, Wisconsin law governing student expulsions also requires notice and a hearing before the expulsion occurs. *See* Wis. Stat. 120.13(1)(c). Derek does not contend that Wisconsin's statutory procedure for student expulsions is constitutionally defective. Instead, his claim is that the District failed to comply with the statutory procedure in his case. He claims that the District expelled him from school without providing him "constitutionally adequate notice or, thus, a meaningful hearing." (Am. Compl. 5502.)

The failure to provide adequate notice in this case, however, assuming the notice was constitutionally deficient, was a "random, unauthorized" act. *See Leavell*, 600 F.3d at 806 ("In sum, because Ms. Leavell simply alleges that the State had in place a procedure to provide notice and that the procedure was not followed with respect to the February 2008 hearing, she is complaining of a 'random and unauthorized' action by a state employee."). Derek cannot credibly claim that the District intentionally provided him defective notice in an effort to undermine the validity of its proceedings. It therefore follows that his procedural due process claim regarding his expulsion can survive only if he can show that the post-deprivation procedures provided under Wisconsin law were inadequate or unfair. *Id.* This he cannot do. Even assuming the notice was improper, the fact that the Hannemanns successfully used the state's post-deprivation appeal process and obtained a reversal of Derek's expulsion demonstrates that the State's appeal process is an adequate remedy.

14

Given the random and unintentional character of an inadvertent failure to strictly comply with statutorily mandated procedure, no pre-deprivation remedy is available to address such procedural defects. Thus, even in criminal proceedings, we rely on an appeal process to insure, as far as possible, that all constitutionally mandated procedural protection has been afforded. The right to administrative and, ultimately, judicial review is an essential part of the procedure Wisconsin prescribes for expelling a student. By ignoring his successful appeal of the expulsion order and focusing on only the hearing and the allegedly deficient notice the District provided, Derek's argument fails to address the entire procedure he was afforded under State law.

Derek nevertheless attempts to show that the State's post-deprivation remedy is inadequate by arguing that the process takes too long and does not provide for *de novo* review. (Pl. Br., Dkt. 34 at 24.) Once an expelled student files an appeal, the state superintendent has sixty days to make a decision, Wis. Stat. § 120.13(1)(e)(3), but Derek contends this is too long relative to the length of a school year. He also complains that the superintendent's review is confined to a review of the record of the school board. Wis. Stat. §120.13(1)(c).

Neither complaint is sufficient to show a denial of due process. Derek provides no authority for his contention that due process can only be satisfied by a *de novo* review of an expulsion decision by the state superintendent. Indeed, if that were the rule, then all judicial proceedings in state and federal courts would be defective since appellate review of factual determinations is always deferential. As to the question of timeliness, a sixty-day time limitation, assuming the State Superintendent uses the entire period he is allowed, is hardly such a delay as to be considered a denial of due process. More importantly, in this case, had the Hannemanns wanted a decision from the State Superintendent before the start of the 2007-2008 school year, they could have filed their

appeal earlier. The expulsion order was issued on May 22, 2006, and by May 11, 2007, the Hannemanns were aware that Derek's early reinstatement had been revoked; they could have filed an appeal at any time thereafter. Instead, the Hannemanns waited until September of 2007 to file the appeal.

Based on the undisputed facts before me, I conclude that Derek's right to due process of law was not violated by the defendants in the 2006 expulsion. I now turn to the 2007 revocation of his conditional reinstatement.

### 2. May 11, 2007 Revocation of Early Reinstatement

Derek was expelled at the end of the 2005-2006 school year but was then conditionally allowed to return to school for the 2006-2007 school year. Derek contends that he was "re-expelled" in May of 2007 without first being given adequate procedural due process. (Pl. Br., Dkt. 34 at 25.) But, as explained above, Derek was not "re-expelled"; instead Derek's conditional reinstatement – allowed as part of his original May 22, 2006 expulsion – was revoked as a result of the additional behavior problems described above. These included the troubling notation on his backpack about killing himself with his last bullet, his agitated confrontation with Bousley over the loss of his notebooks, grabbing and threatening another student in class for writing in his locker, and punching another student.

In Wisconsin a school may expel a student but grant the student conditional early reinstatement. *See* Wis. Stat. § 102.13(h). This is precisely what the School District did in Derek's case on May 22, 2006: he was expelled but allowed to return to school for the 2006-2007 school year conditioned upon his meeting certain requirements. (PRDPFF ¶ 15.) A conditionally readmitted student is essentially on probation because "[i]f a pupil violates an early reinstatement

16

condition . . .the school district administrator or a principal . . . may revoke the pupil's early reinstatement." Wis. Stat. § 102.13(1)(h)(4).

Derek alleges that he did not receive notice or an opportunity to be heard before the School District revoked his conditional reinstatement on May 11, 2007. Failure to afford such procedural due process violates Wisconsin law. Prior to revoking conditional readmission, the student must be afforded certain procedural due process. Specifically:

> before revoking the pupil's early reinstatement, the school district administrator or his or her designee *shall* advise the pupil of the reason for the proposed revocation, including the early reinstatement condition alleged to have been violated, provide the pupil an opportunity to present his or her explanation of the alleged violation and make a determination that the pupil violated the early reinstatement condition and that revocation of the pupil's early reinstatement is appropriate.

Wis. Stat. § 120.13(1)(h)(4) (emphasis added). If the school administrator decides to revoke the pupil's early reinstatement, she must provide prompt written notice of the revocation and the reason for the revocation, including the early reinstatement condition violated, to the pupil and, if a minor, his parents. *Id.* Within five days, the parent may then request a conference with the administrator to address the revocation. A conference must then be held within five days, and if the administrator finds that the student did not violate a reinstatement condition or revocation is not appropriate, the student is reinstated. Wis. Stat. § 120.13(1)(h)6.

In this case, the defendants appear to have substantially complied with this procedure. On April 27, 2007, Vice-Principal Boulsey met with Derek and his father about the notation on his backpack. (Ford Aff., Ex. M.) On May 2, 2007, Bousley met with Derek and his father about the report that he had grabbed another student by the collar in class and threatened him. (*Id.*, Ex. N.) On May 4, 2007, Derek's parents, his attorney, Administrator Innis, Bousley, Mahaffey, and

17

Hannemann met to discuss Derek's situation and his possible expulsion. (PRDPFF ¶ 30.)  Derek's

parents were informed by letter several days later, on May 11, 2007, that conditional reinstatement

was revoked.  (*Id.*, Ex. Q.)  On May 14, 2007, the Hannemanns' attorney sent Superintendent Innis

a letter appealing the decision to revoke Hannemann's reinstatement and requesting a conference

to address it as provided under § 120.13(1)(h)5.  (*Id.*, Ex. S.)  Following the conference, Innis sent

the Hannemanns a letter on June 5, 2007, advising him that based on his review the revocation of

Derek's conditional reinstatement would remain in effect.  The series of meetings with Derek, his

parents and their attorney both before and after the decision to revoke his reinstatement was made

constitutes at least substantial compliance with § 120(1)(h) procedural requirements for revocation

of conditional reinstatement.

   But even if the defendants failed to fully comply with the procedural requirements Wis. Stat.

120.13(1)(h)(4), it again does not follow that his Fourteenth Amendment due process right was

violated.  Derek has cited no case that addresses the process constitutionally required before an

expelled student's conditional reinstatement can be revoked.  Just as the revocation of parole in a

criminal case does not require the full panoply of rights that must attend a conviction, *see Morrissey

v. Brewer*, 408 U.S. 471, 480 (1972), presumably the same is true of the revocation of the

conditional reinstatement of a student under an expulsion order.  "The requirements of due process

are "flexible and call for such procedural protections as the particular situation demands."

*Wilkinson v. Austin*, 545 U.S. 209, 224 (2005).  This is not to say that the student's interest in

avoiding expulsion is not substantial, but the District had already expelled Derek and its expulsion

order was still in effect.  Given that Derek was already under an expulsion order, he was not entitled

to the same procedural rights for the revocation of his early reinstatement.  The notice as to each of

the various misconduct reports and the opportunity to give his side, followed by a conference with Superintendent Innis, were constitutionally sufficient.

Even aside from the question of whether he was afforded due process, however, Derek's claim concerning his revocation fails for the same reason his claim concerning his expulsion fails. That is, to the extent Derek is asserting a violation of his procedural due process rights from the May 11, 2007 revocation decision, such claim is moot because the underlying expulsion has been reversed and he was offered reinstatement. When the State Superintendent reversed the original May 22, 2006 expulsion, the May 11, 2007 decision was rendered meaningless. It is simply impossible to enforce an expulsion that was invalid in the first place. Put another way, because there was no expulsion, there was no conditional reinstatement for the School District to revoke – regardless of how much or how little procedural due process it afforded Derek.

## C. Ban from School Property

Derek's two remaining claims stem from the District's decision to ban him from school property effective March 28, 2008. First, Derek alleges that this ban was put in place without proper procedural due process. Second, he alleges that the ban violates his right to intrastate travel. (Am. Compl. ¶¶ 5503-5504.)

### 1. Due Process

Derek argues that the District violated his right to procedural due process by banning him from school property without notice and an opportunity to be heard. He argues that as a student, he was entitled to notice of the charges and a hearing before such a ban could be imposed. But it is undisputed that Derek was not a *student* at Southern Door County High School when the ban was

instituted. Once expelled from a public school, a person is no longer a student of that school. Upon expulsion, a person's status reverts from that of a student to that of a member of the general public. Although the expulsion order was vacated by the State Superintendent, Derek and his parents elected not to re-enroll him in Southern Door High School. When the ban was put in place, he was a student at Fox Valley Lutheran High School, not Southern Door County High School. As a former student of Southern Door, Derek had no right to be on school property other than whatever right the District afforded to members of the general public.

Southern Door County High School's general practice is to allow members of the public on school property as long as they have a purpose (such as attending a school activity). Even if such a policy allowed members of the general public to come to Southern Door County High School to lift weights, however, the policy does not prevent the school from barring individual members of the public from coming onto school property for reasons specific to them. That is what happened here. It is undisputed that Derek came to Southern Door to lift weights on March 28, 2008. On that date he was no longer a Southern Door student. While on school property he had an altercation with a school teacher – the same teacher who had asked him to leave the day prior. (Hannemann Dep. at 75:1-3.) Derek admits that he punched a locker and used foul language while in the Southern Door County High School's locker room. (*Id.* at 86:18 - 87:14.) Later that day the School District sent Derek a letter banning him from further use of school property.

Derek contends that because the letter he received from the District's attorney does not state when the ban is to be lifted, it is a lifetime ban and will prevent him from coming onto school grounds even for his own children's graduations, should he later have children and remain in the District. In fact, however, there is no evidence that the District intended the ban to last for the rest

20

of Derek's life, and such a reading would not be reasonable. It is true that when asked to explain the District's authority to impose such a ban, the District's attorney did not respond. But that was immediately after the ban was imposed, and neither then nor at any other time did Derek specifically ask the District how long the ban would last or what steps he could take to get it lifted. When asked about the ban during his deposition, Superintendent Innis explained, "we certainly would be open to revisiting it if a request was made, you know, to attend activities or, you know, be on the campus." (Ford Decl., Ex. C, Innis Dep. at 77.) Based on the undisputed evidence, I therefore conclude that the ban imposed by the District was not intended to be permanent. Thus, the issue raised is whether a school district can constitutionally order a non-student banned from its property until further notice without a hearing.

The answer appears to be yes. In *Vukadionovich v. Bd. of School Trustees of Michigan City Area Schools,* a high school principal told a former teacher who was frequently seen on school grounds after he was terminated, and was still volunteering as an assistant basketball coach, to stay away from the high school. The former teacher sued the school district under 42 U.S.C. § 1983, alleging various claims arising out of the termination of his employment and the order that he stay away from the school. With respect to the ban from school grounds, the Court held that "[m]embers of the public have no constitutional right to access public schools." 978 F.2d 403, 409 (7th Cir. 1992).

Similarly, in *Lovern v. Edwards* the Fourth Circuit affirmed the district court's dismissal of a § 1983 suit by a non-custodial parent of public school children against the school superintendent for allegedly violating the parent's constitutional rights by prohibiting him from entering public school property. 190 F.3d 648 (4th Cir. 1999). The superintendent in that case sent a letter to the

parent barring his entry onto school property because of his "continued pattern of verbal abuse and threatening behavior towards school officials." *Id.* at 655. Noting that "[s]chool officials have the authority to control students and school personnel on school property, and also have the authority and responsibility for assuring that parents and third parties conduct themselves appropriately while on school property," the *Lovern* Court concluded that the plaintiff's claims against the superintendent "are plainly insubstantial and entirely frivolous." *Id.* at 655-56; *see also Henley v. Octorara Area School District,* 701 F.Supp. 545, 551 (E.D. Pa. 1988) ("The right to come onto the school property was not such a right as to require any sort of a due process hearing before making the classification that excluded [the non-student]."); *Mejia v. Holt Public Schools*, No. 5:01-CV-116, 2002 WL 1492205, *4 (W.D. Mich. March 12, 2002) ("The cases cited above establish that a school may ban a person, including a parent, from going onto school property in order to preserve order in the educational process or to protect students from potential harm without violating any fundamental right to go onto or access school property. In the instant case, Davis had a reasonable basis for banning Mr. Mejia from school property because of his alleged behavior on school grounds.").

In this case, the events upon which the decision to ban Derek from school property were specifically described in the March 28, 2008 letter from the District's attorney sent to Derek and his parents via certified mail. (Ford Decl., Ex. X.) A school official learned that Derek had punched a locker and Derek has admitted to the same. At no time has Derek denied the events described in the letter. Nor has he apologized or offered assurances that he would refrain from such activity in the future. Instead, he asserted through his attorney that the District had no authority to ban him from school property and that its attempt to do so violated his constitutional rights. (*Id.*)

Conceivably, if the District refused to consider a request to lift the ban and continued it indefinitely, its conduct could give rise to constitutional concerns. Given the authority cited above, however, and given the undisputed evidence before me, I conclude that no due process violation can be shown here. Accordingly, the defendants' motion will be granted as to this claim as well.

### 2. Intrastate Travel

Derek also claims that the School District's ban violated his right to intrastate travel. Both the United States Constitution and the Wisconsin Constitution protect the right to intrastate travel. *See Schor v. City of Chicago,* 576 F.3d 775, 780 (7th Cir. 2009) (noting that the United States Supreme Court has not explicitly held that intrastate travel is a fundamental right protected by the federal constitution); *See also Brandmiller v. Arreola,* 199 Wis.2d 528, 539-40, 544 N.W.2d 894 (1996) ("Thus, independent of federal law, we recognize that the right to travel intrastate is fundamental among the liberties preserved by the Wisconsin Constitution."). Regardless of whether Derek is referring generally to his right to travel locally through public spaces and on roadways or whether he is alleging more specifically that the ban infringes his right to enter into particular types of public facilities and to stay there for certain purposes, there are no genuine issues of material fact.

The right to intrastate travel does not allow one to travel anywhere and everywhere within Wisconsin at his or her pleasure. Certainly some areas are off-limits. *See State v. Holbach,* 763 N.W.2d 761, 763-768 (N.D. 2009) ("An individual has a constitutional right to intrastate travel, however, that right is not absolute and may be restricted." ); *See also Doe v. City of Lafayette,* 377 F.3d 757, 770-71 (7th Cir. 2004) (en banc) (holding that city's ban of sex offender from all public parks did not implicate right to intrastate travel, where offender was "not limited in moving from

place to place within his locality to socialize with friends and family, to participate in gainful employment or to go to the market to buy food and clothing"). For example the right to intrastate travel does not provide unfettered access to police stations, jails, or government office buildings. *Williams v. Town of Greenburgh,* 535 F.3d 71, 76 (2nd Cir. 2008) (holding that ban "until further notice" from use of town building "does not interfere with the right to free movement"). Nor does it provide a right to access school property.

Derek's right to intrastate travel on or through school property is necessarily constrained by his right to be on school property in the first place. As discussed above, as a non-student Derek had a limited right to be on school property – a right school administrators revoked after learning that he caused a disturbance in the locker room and in light of his particular track record with the school. Of course, a government could violate the right to intrastate travel by prohibiting a person's presence in an area so large that the prohibition effectively inhibits travel; for example, if the Plaintiff was excluded not just from Southern Door County School District property, but from all of Door County. *Cf. Johnson v. City of Cincinnati,* 310 F.3d 484, 495 (6th Cir.2002) (finding that ordinance prohibiting those convicted of drug crimes from being present in designated "drug exclusion zones" violated the right to intrastate travel where the ordinance interfered with the "right to travel locally through public spaces and roadways"). But Derek has not alleged that the only way to get from one location to another is to drive through Southern Door County School District property. On no reasonable view of the facts here can the District's ban be said similarly to inhibit Derek's general ability to move from place to place in Door County. Thus, summary judgment is warranted on Derek's claim that the District's ban violated his right to interstate travel.

**D. Qualified Immunity**

Even if the Court is in error in its conclusion that the undisputed facts establish that the defendants did not violate Derek's constitutional rights, an alternative basis for granting summary judgment as to his individual capacity claims for damages against defendants Innis, Mahaffey, and Bousley is the doctrine of qualified immunity. Whether qualified immunity applies is a question of law. *Rakovich v. Wade,* 850 F.2d 1180, 1202 (7th Cir. 1988) (en banc), *cert. denied*, 488 U.S. 968, *overruled on other grounds*, *Spiegla v. Hull*, 371 F.3d 928, 941-42 (7th Cir. 2004.) Government officials performing discretionary functions are shielded from lawsuits insofar as their conduct does not violate clearly established statutory or constitutional rights. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). All officials, except "the plainly incompetent or those who knowingly violate the law," are protected by qualified immunity. *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

Courts apply a two step analysis when analyzing qualified immunity. The initial inquiry asks whether there is a constitutional violation present on the facts alleged and the second question is whether the right was clearly established at the time the violation occurred. *See Saucier,* 533 U.S. at 201. Put another way, qualified immunity applies unless government officials violated the constitution and should have known better in light of clearly established law. Here, for the reasons detailed above, I have not found any violations of constitutional rights, let alone violations by Defendants Innis, Mahaffey or Bousley. Even if I am wrong in this conclusion, I am satisfied that the individual defendants would be entitled to immunity because the law supporting Derek's claims is not clearly established and the defendants were acting with the advice of counsel throughout.

**CONCLUSION**

Accordingly and for the reasons set forth herein Defendants' motion for summary judgment (Dkt.29) is **granted**. Even when viewing the facts in a light most favorable to Plaintiff there is no genuine dispute as to any material fact. The action is ordered dismissed, and the Clerk is directed to enter judgment in favor of the defendants.

**SO ORDERED** this ___7th___ day of June, 2011.

         s/ William C. Griesbach
         William C. Griesbach
         United States District Judge